BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1500/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:     (213) 894-3667/0762
Facsimile:     (213) 894-0141
E-mail:  Ian.Yanniello@usdoj.gov
         Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>                   v.<br><br>KENNETH IWAMASA,<br><br>              Defendant. | No. CR 24-408-SPG<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT KENNETH IWAMASA; EXHIBITS A-D (FILED CONCURRENTLY UNDER SEAL) |

     Plaintiff United States of America, by and through its counsel

of record, the First Assistant United States Attorney for the Central

District of California and Assistant United States Attorneys Ian V.

Yanniello and Haoxiaohan Cai, hereby files its Sentencing Position

Regarding Defendant Kenneth Iwamasa.

//

//

//

This position is based upon the attached memorandum of points and authorities, Exhibits A-D, which have been concurrently filed pending sealing approval, the files and records in this case, and such further evidence and argument as the Court may permit.

Exhibit D is a victim impact statement from L.F., the trustee and executor of Mr. Perry's estate.

Dated: May 13, 2026                          Respectfully submitted,

                                             BILAL A. ESSAYLI
                                             First Assistant United States
                                             Attorney

                                             IAN V. YANNIELLO
                                             Assistant United States Attorney
                                             Chief, National Security Division


                                             _____/s/_____
                                             IAN V. YANNIELLO
                                             HAOXIAOHAN CAI
                                             Assistant United States Attorney

                                             Attorneys for Plaintiff
                                             UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.      INTRODUCTION...............................................1

I.      RELEVANT FACTUAL BACKGROUND................................2

        A.    The Plea Agreement...................................2

        B.    Defendant Was Responsible For Mr. Perry's Medical Care
              And Knew of Mr. Perry's Addiction Struggles.............2

        C.    Defendant Conspired With a Dirty Doctor and A Drug
              Broker To Obtain and Distribute Ketamine...............3

        D.    Defendant Conspired with PLASENCIA.....................4

        E.    Defendant Conspires With FLEMING to Distribute More
              Ketamine to Mr. Perry Despite Clear Warning Signs that
              Self-Administering Ketamine Was Not Safe...............7

        F.    Defendant Purchases 51 Vials of Ketamine from Fleming
              Over the Course of 11 Days............................8

        G.    Defendant Administers Multiple Injections of Ketamine
              on October 28, Resulting In the Death of Mr. Perry......10

        H.    Defendant Concealed His Role In Mr. Perry's Death
              Until Law Enforcement Executed Search Warrants at His
              Residence..........................................11

        I.    Following the Search Warrants, Defendant Admitted He
              Caused Perry's Death and Agreed to Cooperate with Law
              Enforcement.........................................12

II.     SENTENCING GUIDELINES CALCULATION..........................12

        A.    Defendant Obstructed and Attempted to Obstruct Justice...13

        B.    Defendant Was Entrusted to Protect Mr. Perry and
              Abused His Trusted Position to Facilitate the Crimes
              at Issue............................................14

III.    MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE......16

IV.     A 41-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE
        AGGRAVATING CIRCUMSTANCES IN THIS CASE......................18

        A.    Despite Violated His Position of Trust By Repeatedly
              Injecting Perry With Ketamine Despite Obvious Warning

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

      Signs......................................................18

    B.    Defendant Knew He Should Not Be Injecting Mr. Perry
          With Illegal Ketamine....................................19

    C.    A 41-Month Sentence Avoids Unwarranted Disparities.......20

V.    CONCLUSION....................................................20

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    INTRODUCTION**

When defendant Kenneth Iwamasa was hired as Matthew Perry's live-in personal assistant, he was acutely aware that Mr. Perry had suffered from drug addiction for most of his life.  But rather than help Mr. Perry maintain sobriety, defendant became his enabler and drug supplier.  Throughout October 2023, defendant repeatedly injected Mr. Perry with doses of ketamine without proper medical training or the equipment necessary to ensure the drug was being safely administered.  As defendant injected more and more ketamine into Mr. Perry, he saw --- **and was the only person to see** --- clear warning signs that Mr. Perry was in danger.  At least two times in October, defendant found Mr. Perry unconscious inside of his home; he also saw Perry "freeze up" and lose the ability to speak after a large ketamine injection.  Ignoring these warnings, defendant continued to inject Mr. Perry with ketamine, including a fatal dose on October 28, 2023.

After Mr. Perry's death, defendant continued his wrongdoing by destroying evidence and taking other steps to cover his tracks and obstruct justice. After investigators executed a search warrant at defendant's residence in January 2024, defendant accepted responsibility and agreed to cooperate in the government's investigation.

For the reasons set forth below, the government submits that a sentence of 41 months' imprisonment balances the significant cooperation defendant provided to the government --- including information that furthered the prosecution of several co-conspirators and the ultimate source of the fatal ketamine --- with the serious

nature of defendant's criminal conduct and the life-ending harm it caused.  Under the circumstances, the recommended sentence is necessary, just, and appropriate to adequate to account for defendant's crimes and satisfy the sentencing goals of 18 U.S.C. § 3553(a).

**I.    RELEVANT FACTUAL BACKGROUND**

**A.    The Plea Agreement**

Defendant pleaded guilty pursuant to a plea agreement to a single-count information charging him with conspiracy to distribute ketamine resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i).  (See Dkt. 20 [Amended Plea Agreement].)

**B.    Defendant Was Responsible For Mr. Perry's Medical Care And Knew of Mr. Perry's Addiction Struggles[1]**

Defendant had known Mr. Perry since approximately 1992 and became his live-in assistant in 2022.  (PSR ¶¶ 80, 110.)  In this role, defendant was paid $150,000 per year and had various responsibilities, including those related to Mr. Perry's medical care.  Defendant exercised considerable discretion over Mr. Perry's medical welfare: he spoke directly with Mr. Perry's doctors without Mr. Perry present and received medical advice from those doctors, including that a doctor had "addictions concerns" that Mr. Perry might be abusing ketamine, and a stern warning that ketamine should not be "self-administer[ed]."  (Ex. C.)  While defendant was responsible for coordinating medical appointments, speaking for Mr. Perry in those appointments, and for making sure Mr. Perry took the medication that he was lawfully prescribed by treating physicians,

---

[1] Unless otherwise noted below, all following facts are recited from the Amended Plea Agreement.  (Dkt. 20.)

defendant was not a medical professional. Quite the opposite: defendant had no expertise or training in medicine, including safe use of controlled substances like ketamine.

Defendant's lengthy history with Mr. Perry made him acutely aware of Perry's life-long struggle with drug abuse and addiction. And defendant knew that Perry had sought professional intervention and help on multiple occasions to treat his drug addiction and maintain his sobriety.  Additionally, as defendant admitted when he spoke with LAPD investigators on the day that Mr. Perry died (October 28, 2023), Mr. Perry had employed sober companions until just months before his death and, from speaking with those individuals, defendant admitted the sober companions thought Mr. Perry was using pain as a ruse to increase his access to ketamine.  (Ex. A at 1.)

**C.    Defendant Conspired With a Dirty Doctor and A Drug Broker To Obtain and Distribute Ketamine**

Beginning in or around September 2023, Mr. Perry requested defendant's assistance procuring illegal ketamine for Mr. Perry's use.  To that end, Mr. Perry provided defendant with money, or promised to reimburse him, and directed him to find sources from whom to acquire the drugs, and defendant complied.

Beginning on an unknown date but no later than in or around September 2023, and continuing until at least the date of Mr. Perry's death on October 28, 2023, defendant conspired with others known and unknown, including Salvador Plasencia (PLASENCIA) and Erik Fleming (FLEMING) to knowingly and intentionally distribute ketamine to Mr. Perry.

3

**D.   Defendant Conspired with PLASENCIA**

On or about September 30, 2023, Individual 1 introduced Mr. Perry to PLASENCIA as a possible source of ketamine supply. Individual 1 identified PLASENCIA as a medical doctor who went by the name, "Dr. P." On September 30, 2023, Mr. Perry communicated with PLASENCIA to purchase liquid ketamine and ketamine lozenges from PLASENCIA. Later that day, PLASENCIA traveled to a residence belonging to Mr. Perry, located in the Central District of California, where PLASENCIA met with defendant and Mr. Perry PLASENCIA injected Mr. Perry with approximately two shots of ketamine that PLASENCIA administered approximately 15 minutes apart.

While at Mr. Perry's residence, PLASENCIA gave instructions to defendant about how to administer ketamine through an intramuscular injection, including where to make injections on Mr. Perry's body. Before leaving the residence, PLASENCIA provided multiple syringes to defendant and Mr. Perry so that they could self-administer the ketamine to Mr. Perry, and left behind at least one vial of ketamine with liquid still remaining in it. Defendant paid PLASENCIA approximately $4,500 in cash for ketamine.

Two days later, on October 2, 2023, defendant began communicating with PLASENCIA to purchase more ketamine.  At approximately 5:47 p.m. on October 2, PLASENCIA sent text messages to defendant stating, "For 8 treatments we can just make it an even 25k" and "I will bring needles of higher gauge." In response, defendant explained that Mr. Perry was interested in purchasing 8 vials of ketamine, not ketamine treatments, stating: "Want to end up with 8 bottles of dr pepper, not just 8 sessions." PLASENCIA confirmed he "Understood." On or before October 2, defendant also purchased

ketamine lozenges from PLASENCIA in exchange for approximately $2,000.

On October 4, 2023, defendant told PLASENCIA he needed additional vials of ketamine, stating, "I will need to get more cans of dr pepper from you today, I can come to you to make it convenient." Defendant also informed PLASENCIA that he had successfully injected Mr. Perry with ketamine, stating: "Found the sweet spot but trying different places led to running out" of ketamine. In response, PLASENCIA said "I have ideas on how to get consistent results" and confirmed he would deliver more ketamine to defendant on October 4.

Later on October 4, at approximately 12:20 p.m., defendant told PLASENCIA "I need some [ketamine] now can I come to you please[?]" After PLASENCIA confirmed he was on his way to acquire more ketamine from his source, which PLASENCIA advised was an individual in San Diego, California, defendant stated the following: "How many cans are you bringing? And when do you think youd be here?" PLASENCIA confirmed that he was "currently retrieving 4 bottles." PLASENCIA later arrived at Mr. Perry's residence where PLASENCIA injected Mr. Perry with ketamine and sold additional ketamine to Mr. Perry in exchange for payment. PLASENCIA left the residence shortly after injecting Mr. Perry with ketamine.

On October 6, 2023, defendant again communicated with PLASENCIA about acquiring more ketamine for Mr. Perry, stating: "Do you have the other 2 of the 8 or any tonight?" PLASENCIA responded, "About tonight I may be able to get you those remaining two tonight" and "How late is too late?" Defendant confirmed that "[i]ts never too late if that's the soonest, meanwhile I have 1 left." That night,

PLASENCIA traveled to Mr. Perry's residence and injected Mr. Perry with ketamine before selling additional vials for defendant to administer without necessary medical oversight.

The following day, on October 7, 2023, defendant reached out to PLASENCIA again to ask if PLASENCIA could provide more ketamine. PLASENCIA confirmed he could, stating, "I can get more yes" and "How soon do you need them?" Defendant responded: "Tomorrow morning probably" and asked if he could pay PLASENCIA with "something besides cash" since "[i]ts hard to get to the bank on the fly with all thats going on which happens so fast now." In response, PLASENCIA agreed to deliver more ketamine the following day.

A short time later, however, defendant informed PLASENCIA "I just ran out" of ketamine and asked if he could meet PLASENCIA to obtain more. At approximately 11:29 p.m., PLASENCIA confirmed he had two bottles of ketamine to sell to defendant and agreed to meet in Santa Monica, California, stating: "Im at third street promenade now … If [y]ou would like to meet now." At 11:47 p.m., defendant told PLASENCIA he sent $3,000 by electronic payment and "im bringing 3 more leaving now." At approximately 12:30 a.m. on October 8, 2023, PLASENCIA sold defendant two vials of ketamine for approximately $6,000.

Between October 9 and 10, 2023, defendant and PLASENCIA continued to communicate about obtaining more ketamine. On October 10, 2023, PLASENCIA agreed to meet defendant and Mr. Perry at a parking lot located in Long Beach, California, to transfer additional ketamine to defendant. Defendant drove Mr. Perry to the arranged meeting location and parked the car while waiting for PLASENCIA to arrive. At the time, Mr. Perry was sitting in the back seat of the

6

car. When PLASENCIA arrived, he entered the back seat of the car and injected Mr. Perry with a shot of ketamine. After injecting Mr. Perry, PLASENCIA gave defendant and Mr. Perry multiple vials of ketamine and got out of the vehicle.

On October 12, 2023, Mr. Perry received a ketamine infusion treatment from Individual 2 at Individual 2's office. After the treatment, defendant contacted PLASENCIA to purchase additional ketamine from PLASENCIA. PLASENCIA later traveled to Mr. Perry's residence and met with Mr. Perry and defendant. After PLASENCIA administered a large dose of ketamine to Mr. Perry, Perry experienced an adverse medical reaction. Among other things, the ketamine caused a significant spike to Mr. Perry's systolic blood pressure and caused Mr. Perry's body to "freeze up" such that Mr. Perry could not talk or move. PLASENCIA and defendant then struggled to move Mr. Perry onto a couch. During the event, PLASENCIA stated something to the effect of, "let's not do that again." PLASENCIA subsequently left the residence after leaving additional vials of ketamine for defendant to administer to Mr. Perry.

In total, between September 30 to October 28, 2023, defendant met with PLASENCIA on no less than seven occasions to obtain ketamine from PLASENCIA. In total, defendant paid PLASENCIA at least $55,000 of Mr. Perry's money to purchase liquid ketamine and ketamine lozenges.

**E.    Defendant Conspires With FLEMING to Distribute More Ketamine to Mr. Perry Despite Clear Warning Signs that Self-Administering Ketamine Was Not Safe**

Beginning on or about October 10, 2023, defendant and Mr. Perry began looking for additional sources of ketamine for Mr. Perry.

On October 10, 2023, defendant sent a text message to FLEMING to ask about purchasing ketamine, stating: "Hey Erik, Alfred here batmans butler He said I can text you directly. How much do you want per bottle and what is the nice tip you want." FLEMING responded, "perfect- and ill bring to you" and "Getting price now. I need some upfront to pay when I pick up. And rest when I deliver." FLEMING subsequently told defendant via text messages that he could obtain 10ml vials of ketamine for $300 and requested a $1,000 brokering fee.

Over the next few days, defendant and FLEMING continued to discuss obtaining ketamine to distribute to Mr. Perry. On October 10, FLEMING forwarded a screenshot of text messages he exchanged with his ketamine source that stated, "It's unmarked but it's amazing – he take one and try it and I have more if he likes." FLEMING clarified that the message was from his ketamine dealer, noting: "[j]ust got this from my person. She only deal[s] with high end and celebs. If it were not great stuff she'd lose her business." FLEMING subsequently agreed to obtain a sample of ketamine from his drug supplier and deliver it to defendant in exchange for $180. Defendant agreed to purchase the ketamine and told FLEMING:

> If it works [Mr. Perry will] probably want all the supply, only interested in the unmarked ones not the horsey version. Confirm with supply that the unmarked one is u.s. non veterinary supply or whatever they will tell you when you ask.

**F.    Defendant Purchases 51 Vials of Ketamine from Fleming Over the Course of 11 Days**

On October 13, 2023, FLEMING drove to Mr. Perry's residence and delivered a sample vial of ketamine to defendant in exchange for payment. A short time later, defendant sent a text message to FLEMING describing Mr. Perry's response to the ketamine, stating "seems good

8

... What number of bots does she have?", referring to FLEMING's ketamine supplier. FLEMING responded, "As many as u want" and "Let me know how many he wants and I'll confirm what she can get. But as of now she said she can fill any order." In response, defendant stated he would purchase the following for Mr. Perry: "25 vials $5500 @220 +500 for you for logistics." On October 14, 2023, FLEMING delivered 25 vials of ketamine to defendant in exchange for approximately $6,000, paid with Mr. Perry's money.

On October 23, 2023, defendant sent a text message to FLEMING to purchase more ketamine, stating: "Can we do same as last time again over next 2 days?" FLEMING confirmed he could obtain the ketamine, stating: "It will be same product. You want same amount? Put the 5500 together asap and ill come get it as soon as possible to get it all done tonight." FLEMING traveled to Mr. Perry's primary residence at approximately 8 p.m. on October 23 and picked up approximately $6,000 in cash from defendant. Defendant understood that $5,500 of the cash he paid was to be delivered by FLEMING to FLEMING's drug source, and defendant separately paid $500 to FLEMING as FLEMING's cut for brokering the deal.

On October 24, 2023, in text messages, defendant and FLEMING communicated about FLEMING acquiring the ketamine from his drug source. At approximately 10:47 a.m., FLEMING told defendant, "It's on its way to our girl. I should have an ETA anytime soon." FLEMING subsequently picked up 25 vials of ketamine from his drug source and delivered the ketamine to defendant at Mr. Perry's residence at approximately 10:52 p.m.

**G.    Defendant Administers Multiple Injections of Ketamine on October 28, Resulting In the Death of Mr. Perry**

During the month of October 2023, defendant found Mr. Perry unconscious at his residence on at least two occasions.  As described above, defendant also saw Mr. Perry suffer an immediate adverse reaction to ketamine after PLASENCIA administered a shot on October 12.  Despite these clear warning signs that Mr. Perry had relapsed into his addiction and that it was not safe for defendant to continue to administer the drugs, defendant increased the amount of ketamine he was injecting into Perry.  Specifically, in the days leading up to October 28, 2023, at Mr. Perry's direction, defendant injected Mr. Perry with significant quantities of ketamine. For example, between October 24 and October 27, 2023, defendant injected Mr. Perry with approximately 6-8 shots per day.

On October 28, 2023, defendant injected Mr. Perry with a shot of ketamine at approximately 8:30 a.m. At approximately 12:45 p.m., defendant injected Mr. Perry with a second ketamine shot while Mr. Perry watched a movie. Approximately 40 minutes later, Mr. Perry asked defendant to prepare the jacuzzi for Mr. Perry and told defendant, "shoot me up with a big one," referring to another shot of ketamine. Defendant filled a syringe with ketamine and administered it to Mr. Perry while he was in or near the jacuzzi. All of the ketamine defendant administered to Mr. Perry on October 28, 2023 had been provided by FLEMING and his drug source, Jasveen SANGHA.

Soon after injecting Mr. Perry with the third shot of ketamine, defendant left the residence to run errands for Mr. Perry.  After returning to the residence, defendant found Mr. Perry face down in the jacuzzi and deceased.

10

The Los Angeles County Medical Examiner Medical conducted an autopsy and determined that Mr. Perry had a significant amount of ketamine in his blood and that his death resulted from the "acute effects of ketamine." Mr. Perry's death was due to effects of ketamine and that but for the presence of ketamine in Mr. Perry's bloodstream, Mr. Perry would not have died on October 28, 2023.

**H.    Defendant Concealed His Role In Mr. Perry's Death Until Law Enforcement Executed Search Warrants at His Residence**

On October 28, 2023, after defendant called 911 to Mr. Perry's residence, defendant was questioned by LAPD officers.  (Ex. A.)  When asked about what medications Mr. Perry was currently taking, defendant provided a robust list of treating doctors and medications Mr. Perry had been prescribed.  (Id. at 2-3.)  Defendant, however, purposefully omitted ketamine from the list.  (Id.)  When defendant recounted the events leading up to Mr. Perry's death, defendant provided a chronology that concealed the ketamine injections defendant had administered to Mr. Perry, including the third shot that defendant administered just hours before.  (Id. at 3-4.)

Defendant also took steps to remove and destroy evidence related to Mr. Perry's use of ketamine in the days leading up to his death. (See PSR ¶ 38.)  After doing so, defendant contacted FLEMING on the phone and told him that he had cleaned up the scene, including the ketamine bottles and syringes, and that he had "deleted everything." (Id.)

After uncovering evidence related to defendant's role in procuring ketamine for Mr. Perry, agents executed search warrants in January 2024, including at defendant's residence.  There, defendant was again interviewed by investigators.  (See Ex. B.).  During this

11

interview, defendant changed his story and disclosed the partial truth.  Defendant finally revealed that a "Dr. P," --- referring to PLASENCIA --- had been injecting Mr. Perry and leaving bottles of ketamine with Mr. Perry.  (Id. at 2.)  Defendant continued to lie, however, and claimed that Mr. Perry injected himself with ketamine.  (Id.)  In fact, defendant was asked multiple times if he injected Mr. Perry with ketamine, and he repeatedly denied that he had (id. at 2, 4, 5), including by asserting that Mr. Perry was capable of giving himself the final injection even when Mr. Perry was already under the effects of earlier injections.  (Id. at 2.)  When asked whether Mr. Perry had any ketamine on October 28, 2024, before defendant left to run errands, defendant again lied and said no. (Id. at 2.)

At no point did defendant disclose that defendant had purchased illegal ketamine from co-conspirator FLEMING.  Nor did defendant disclose that he had been injecting Mr. Perry since early October 2023, including just hours before Mr. Perry was found deceased.

### I.   Following the Search Warrants, Defendant Admitted He Caused Perry's Death and Agreed to Cooperate with Law Enforcement

Following the January 2024 search warrants, investigators conducted additional interviews of defendant, where he came clean and admitted his role in Mr. Perry's death.  Among other things, defendant told investigators about FLEMING's role in the conspiracy, and that the defendant had injected FLEMING's drugs into Perry on the day of his death.

### II.  SENTENCING GUIDELINES CALCULATION

The government partially concurs with USPO's calculation in the PSR.  The government agrees that defendant's base offense level is 26, see U.S.S.G. § 2D1.1(a)(4), and that defendant should be afforded

a three-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1(a), (b).  As discussed below, the government submits that the circumstances of this case warrant two additional enhancements: a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1; and a two-level enhancement for abuse of position of trust under U.S.S.G. § 3B1.3.

After the three-level reduction for acceptance of responsibility, defendant's total offense level would be 27 with a resulting Guidelines range of 70 to 87 months (based on a criminal history category I).[2]

**A.    Defendant Obstructed and Attempted to Obstruct Justice**

Under U.S.S.G. § 3C1.1, a two-level enhancement applies when "the defendant willfully obstructed or impeded, or attempted to obstruct or imped, the administration of justice."  The circumstances warrant the application of this enhancement for at least three reasons: (1) defendant personally took steps to conceal and destroy evidence by discarding and removing relevant evidence from Mr. Perry's residence, including used and unused ketamine vials that defendant obtained from FLEMING; (2) following Mr. Perry's death, defendant coordinating with FLEMING to conceal the co-conspirators criminal wrongdoing, including by confirming that defendant had "deleted everything"; and (3) defendant actively obstructed the investigation by repeatedly lying to investigators about, *inter alia*, whether Mr. Perry was using ketamine, who injected Mr. Perry, and the sources of the illegally obtained ketamine.  See U.S.S.G. § 3C1.1.,

---

[2] If the Court declines to find these enhancements, the government requests the Court to consider the underlying facts as aggravating factors and vary upward to the same range after considering the § 3553(a) factors, discussed below.

Application Note. 4(D), (H) (obstructive conduct includes, *inter alia*, destruction and attempted destruction of evidence, and providing materially false statements to officers that significantly obstruct an official investigation).

**B.   Defendant Was Entrusted to Protect Mr. Perry and Abused His Trusted Position to Facilitate the Crimes at Issue**

Defendant also abused a position of private trust.  See U.S.S.G. § 3B1.3.  Since 2022, defendant maintained a unique and trusted position as a gatekeeper to Mr. Perry's welfare and his ongoing addiction battle.

Defendant lived at Mr. Perry's home, had 24/7 access to Mr. Perry, and was charged with overseeing Mr. Perry's medical care, including by being entrusted to speak on Mr. Perry's behalf to doctors without Mr. Perry being present.  (See Ex. C (detailed notes maintained by defendant related to a July 18, 2023 doctor's appointment he had by "myself without [Mr. Perry] in attendance that I decided to take myself and fully covered all our issues").  Defendant was warned by Mr. Perry's doctor that the doctor had "addictions concern about ketamine" and was explicitly warned by that doctor that ketamine should not be "done as a self-administered program."  (Id.; see also PSR ¶ 57).  Defendant also learned from Mr. Perry's former sober companions that Mr. Perry might have been exaggerating pain to seek ketamine treatments from actual doctors.  (Ex. B at 1.)  Notwithstanding these red flags, defendant undertook to get more ketamine from unscrupulous doctors, and then from a street dealer.  Defendant could have alerted any number of people in Mr. Perry's life, including Mr. Perry's family, or the legitimate doctors in Mr. Perry's life, to seek help for Mr. Perry's relapse,

14

but instead, he continued buying illegal drugs, and hid this fact from all who could help.

Defendant therefore abused a position of private trust.  And while defendant might argue that he merely followed Mr. Perry's orders and lacked the discretion required to merit the enhancement, he is incorrect.  The enhancement applies to individuals whose position of trust is "characterized by professional or managerial discretion" and whose role "contributed in [a] significant way to facilitating the commission or concealment of the offense." See U.S.S.G. § 3B1.3, Application Note 1.  Even those who have the title of a mere "assistant" can trigger the enhancement when they are given considerable discretion with "very little oversight."  United States v. Bradshaw, 670 F.3d 768, 770 (7th Cir. 2012) (rejecting defendant's characterization that she was 'merely 'an administrative assistant without significant authority'").  Such was the case with defendant, who was entrusted with large amounts of Mr. Perry's cash and acted in a caretaker role with respect to Mr. Perry's medical care and entrusted with discretion to speak on his behalf to his doctors.  See, e.g., United States v. Zamarripa, 905 F.2d 337, 340 (10th Cir. 1990) (babysitter occupied position of trust that enabled him to commit the crime more easily than others).  In this case, defendant's position of trust and access to Mr. Perry's home allowed him to dispose of vials of ketamine that he helped procure, and to try to "delete everything" on Mr. Perry's digital devices.

Defendant had the requisite discretion and position of trust, but simply chose not to exercise them to Mr. Perry's benefit.

## III. MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

Based on defendant's cooperation and substantial assistance provided to the government, the government seeks a seven-level downward departure under U.S.S.G. § 5K1.1.

U.S.S.G. § 5K1.1 enumerates several factors that the Court should consider when determining whether a departure for "substantial assistance to authorities" is appropriate, including: (1) the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of the information provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) the danger or risk of injury to the defendant or his family resulting from his assistance; and (5) the timeliness of his assistance.

In this case, defendant provided significant and credible information related to the drug conspiracy. While defendant initially obstructed the investigation (as detailed above), he later provided material information after law enforcement searched his home in January 2024. Among other things, defendant described his role in the scheme and provided information about his co-conspirators, including PLASENCIA and FLEMING.

While law enforcement had already identified PLASENCIA as a likely source of ketamine prior to defendant's cooperation,[3] defendant provided useful information that was meaningful to the government's prosecution of PLASENCIA, including information about PLASENCIA teaching defendant to inject Perry with ketamine and

---

[3] Law enforcement executed search warrants at locations associated with PLASENCIA on the same day in January 2024 that warrants were executed at defendant's residence.

16

details about PLASENCIA's unethical and illegal conduct in October 2023.

Defendant also provided meaningful information that helped law enforcement identify FLEMING as the source of the ketamine that caused Mr. Perry's death, which allowed law enforcement to expediently build evidence to obtain a warrant to search FLEMING's residence.  Through this information --- and information subsequently obtained as a result of the search of FLEMING's home --- law enforcement quickly identified Jasveen SANGHA, who had sold drugs for years and contributed to at least two deaths.

The government's requested seven-level departure also credits defendant with promptly agreeing to plead guilty pursuant to a cooperation plea agreement, and agreed to testify against his co-conspirators.  Defendant was the first of five defendants to plead guilty, which undoubtedly contributed to the strength of evidence against his various co-conspirators.

Based on the nature, extent, and timeliness of defendant's assistance,[4] the government moves for a seven-level departure, which results in a total offense level of 20 and an advisory Guidelines range of 33 to 41 months.  If granted, the seven-level reduction significantly credits defendant's cooperation by reducing the applicable guidelines range by more than 50 percent.

---

[4] As the Court assessed during FLEMING's sentencing, the circumstances of this case do not create the level of danger or risk to cooperators when compared to most drug trafficking cases which often involve gang- or cartel-related activity.

**IV.    A 41-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE AGGRAVATING CIRCUMSTANCES IN THIS CASE**

For the reasons set forth below, the government recommends that the Court sentence defendant to: (i) 41 months' imprisonment; (ii) followed by three years' supervised release; (iii) a $10,000 fine, and (iv) a mandatory special assessment of $100.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.    Despite Violated His Position of Trust By Repeatedly Injecting Perry With Ketamine Despite Obvious Warning Signs**

Defendant had a front row seat to Mr. Perry's relapse into serious drug use, including the many adverse reactions Perry was suffering as a result.  At least two times in October 2023, defendant found Perry unconscious in his home.  Defendant also witnessed PLASENCIA inject Perry with a large dose of ketamine that caused him to "freeze up" and be unable to move or speak.  (PSR ¶ 26.)  Even PLASENCIA at that point stated, "let's not do that again."  But far from not doing that again, defendant had already begun arranging for a steady --- and cheaper --- supply of ketamine from FLEMING.  Just one day later, on October 13, defendant arranged to receive a sample vial of ketamine from FLEMING, and after testing it on Mr. Perry, confirmed a much larger order for 25 additional vials.  (PSR ¶ 31.)  Defendant injected Perry with so much ketamine he ran through the 25 vials in less than ten days, resulting in defendant placing an order to purchase 25 more vials from FLEMING on October 23.  (PSR ¶ 32.)

As defendant watched Perry spiral into darkness, he could have taken steps at any point to pull Perry back into the light. Defendant could have contacted Mr. Perry's family members or sought

18

professional help to address Perry's drug relapse, or he could have simply said "no" when Perry asked for another ketamine injection. But he chose not to help, and instead concealed the ongoing danger to Mr. Perry, which ultimately resulted in his death. Defendant's conduct warrants a significant sentence in light of the harm he caused.

**B.  Defendant Knew He Should Not Be Injecting Mr. Perry With Illegal Ketamine**

Defendant had a relatively comfortable upbringing that afforded him with the sophistication and education to know better than to inject his employer with ketamine. Defendant grew up in a "close-knit" home with siblings and a father who worked as a chemist and a mother who was an assistant manager at a broadcasting company. (PSR ¶ 78.) Defendant's community was "sheltered and affluent," with an "extraordinary school system," and he went to college for environmental studies, architecture, and photography, before deciding on a career in the entertainment and film industry. (PSR ¶ 79.)

After defendant came into the employ of Mr. Perry, defendant interacted with multiple people who worried about the risk of ketamine addiction. Rather than heed those warnings, defendant took matters into his own hands to inject Mr. Perry multiple times every day until Mr. Perry died --- despite one of Perry's doctors expressly warning defendant against self-administering ketamine. Defendant had the wherewithal, sophistication, and warnings necessary to know that what he chose to do was wrong, but he did it anyway. This is an aggravating fact that warrants a high-end Guidelines sentence.

19

### C.    A 41-Month Sentence Avoids Unwarranted Disparities

Sentencing defendant to a high-end Guidelines sentence is just punishment for his crimes and will avoid sentencing disparities with similarly situated individuals.  The government's recommended sentence balances the significant cooperation defendant provided to the government --- including being the first defendant to cooperate against others --- with the serious nature of the criminal conduct and the significant harm it caused.  Indeed, a defendant who distributes illicit ketamine that causes a victim's death, who obstructed justice to cover his involvement, should expect a significant custodial sentence that falls within the relevant Guidelines range, or higher.

The government's recommended sentence is also justified in light of the relative culpability of defendant's co-conspirators.  Unlike the dirty doctors, who provided illegal ketamine but did not provide the fatal drugs, defendant delivered the fatal dose by his own hand, witnessed Mr. Perry's multiple, severe adverse reactions to the drug, and was therefore more culpable.  And although FLEMING brokered the sale of the fatal vials, FLEMING's role was more limited compared to defendant's active role injecting Mr. Perry multiple times a day in the weeks before his death.  Defendant is also significantly less culpable than SANGHA, whose drug dealing spanned many years and included a myriad of drugs, including methamphetamine.  Thus, a 41-month sentence is proportionate, avoids disparities, and satisfies the § 3553(a) factors.

### V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 41 months'

20

imprisonment; (ii) followed by 3 years' supervised release; (iii) a fine of $10,000, and (iv) a mandatory special assessment of $100.

21